# UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

| | |
|---|---|
| WAYNE E. ANDERSON, Individually and On Behalf of All Others Similarly Situated, | **No.** `13-cv-2261 EFM/DJW` |
| Plaintiff, | **CLASS ACTION** |
| v. | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| SPIRIT AEROSYSTEMS HOLDINGS, INC., JEFFREY L. TURNER, and PHILIP D. ANDERSON, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Wayne E. Anderson ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Spirit AeroSystems Holdings, Inc. ("Spirit AeroSystems" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Spirit AeroSystems

securities between May 5, 2011 and October 24, 2012, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder against the Company and certain of its top officials.

2.      Spirit AeroSystems designs and manufactures aerostructures fuselages, propulsion systems and wing systems for commercial and military aircrafts. The Company's main customers are The Boeing Company ("Boeing") and Airbus SAS ("Airbus").

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company was having difficulties in executing its diversification and growth strategy as it expanded its customer-base, manufacturing sites, and product design capabilities, while managing multiple development programs with significant design changes and schedule delays; (ii) the Company lacked adequate internal and financial controls, specifically adequate controls over cost overruns on its 787 program, G650 Wing program, BR725 program and the G280 Wing program; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

4.      On October 25, 2012, the Company disclosed for the first time that it expected to record charges against 2012 earnings, and to future years' earnings, totaling $590 million, attributed to significant operational problems across multiple product lines. Analysts immediately voiced suspicions that defendants had misled investors regarding the profitability of the 787 program, sustained free cash flows and the fact that there was an impending write-down

which accounted for nearly 20% of Spirit AeroSystems' contractual revenues. As one analyst stated, "*[T]he broader question, when you look at the size of this write-off, which is considerably larger than most of us had estimated, it looks like it's something like 18% to 19% of the contractual revenues in these accounting blocks. How could you have made a miss quite that big and not seen it earlier?"*

5.      On this news, Spirit AeroSystems stock declined $6.55 per share or 30%, to close at $15.11 per share on October 25, 2012.

6.      As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

9.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as Spirit AeroSystems's principal place of business is located within this District.

10.      In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.     Plaintiff as set forth in the attached Certification, acquired Spirit AeroSystems securities at artificially inflated prices during the Class Period and has been damaged thereby.

12.     Defendant Spirit AeroSystems is a Delaware corporation with its principal executive offices located at 3801 South Oliver, Wichita, Kansas 67210.  Spirit AeroSystems's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "SPR."

13.     Defendant Jeffrey L. Turner ("Turner") was, at all relevant times, the Company's the President and Chief Executive Officer.

14.     Defendant Philip D. Anderson ("Anderson") has been the Company's Chief Financial Officer and Senior Vice President since February 2010.

15.     The defendants referenced above in ¶¶ 13 and 14 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Spirit AeroSystems is one of the largest independent non-OEM (original equipment manufacturer) aircraft parts designers and manufacturers of commercial aerostructures in the world, based on annual revenues, as well as the largest independent supplier of aerostructures to Boeing. In addition, the Company is one of the largest independent suppliers of aerostructures to Airbus. Boeing and Airbus are the two largest aircraft OEMs in the world. Aerostructures are structural components such as fuselages, propulsion systems and wing systems for commercial and military aircraft. For the twelve months ended December 31, 2011, the Company generated net revenues of $4.8 billion, and had net income of $192.4 million.

4

**Materially False and Misleading**
**Statements Issued During the Class Period**

17.     On May 5, 2011, Spirit AeroSystems issued a press release announcing its first

quarter 2011 financial results, reporting first quarter revenues of $1.05 billion, operating income

of $70 million, fully diluted earnings per share of $0.24, and cash and cash equivalents of $311

million. On May 6, 2011, the Company filed its first quarter 2011 financial results with the SEC

on Form 10-Q, reiterating the results discussed above.

18.     On May 5, 2011, JP Morgan Securities issued an analyst report advising a neutral

position on the stock. The JP Morgan report specifically advised investors that even though the

Company missed its earnings estimates, the Company had reported positive information

regarding free cash flows, and therefore appeared to be in line to stabilize its cash flow in the

near term, a critical financial measure for Spirit AeroSystems.

19.     On May 17, 2011, Spirit AeroSystems issued a press release announcing the

signing of "the formal contract amendment with The Boeing Company regarding certain claims

associated with the development and production of the 787-8 airplane."  The press release further

stated the following in relevant part:

> The amendment completes the previously announced memorandum of agreement.
>
> "With this agreement we continue to reinforce our partnership with our largest
> customer as we work together for the long-term success of the 787 program," said
> Phil Anderson, Spirit Senior Vice President and Chief Financial Officer.

20.     On August 4, 2011, the Company announced financial and operating results for

the quarter ended June 30, 2011. For the quarter, the Company reported net income of $30

million, or $0.21 diluted earnings per share ("EPS") and revenue of $1.5 billion, as compared to

5

net income of $55 million, or $0.39 diluted EPS and revenue of $1.1 billion for the same period a year ago.

21.     On August 5, 2011, the Company filed a quarterly report for the period ended June 30, 2011 on a Form 10-Q with the SEC, which was signed by Defendant Anderson, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Turner and Anderson, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22.     On November 3, 2011, Spirit AeroSystems issued a press release announcing its financial and operating results for the quarter ended September 29, 2011.  For the quarter, the Company reported net income of $67 million, or $0.47 diluted EPS and revenue of $1.1 billion, as compared to net income of $46 million, or $0.33 diluted EPS and revenue of $1 billion for the same period a year ago. The Company also announced cash flow from operations of $66 million for the third quarter of 2011, compared to a $122 million use of cash for the third quarter of 2010, and cash balances of $138 million.

23.     On November 4, 2011, the Company filed a quarterly report for the period ended June 29, 2011 on a Form 10-Q with the SEC, which was signed by Defendant Anderson, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Turner and Anderson, stating that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     On November 4, 2011, JP Morgan published an analyst report which further advised investors that after reviewing the Company's current financial statements, "margin and cash flow are two key swing factors for the stock . . . [and] Despite moderately reduced 2011 cash flow guidance, the 2012 picture looks modestly better as we still see a path to positive territory."

25.     On February 9, 2012, Spirit AeroSystems issued a press release announcing its financial and operating results for the quarter and year ended December 31, 2011. For the quarter, the Company reported net income of $60 million, or $0.42 diluted EPS and revenue of $1.2 billion, as compared to net income of $62 million, or $0.44 diluted EPS and revenue of $1.1 billion for the same period a year ago.  For the year, the Company reported net income of $192 million, or $1.35 diluted EPS and revenue of $4.9 billion, as compared to net income of $219 million, or $1.55 diluted EPS and revenue of $4.2 billion for the same period a year ago.

26.     On February 23, 2012, the Company filed an annual report for the period ended December 31, 2011 on a Form 10-K with the SEC, which was signed by among others, Defendants Turner and Anderson, and reiterated the Company's previously announced financial results and financial position.   In addition, the Form 10-K contained signed certifications pursuant to the SOX by Defendants Turner and Anderson, stating that the financial information contained in the Form 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

27.     On March 7, 2012, Spirit AeroSystems held an investor conference in Wichita, Kansas. The Company had given investors a tour of its factory, as well as a presentation by the Company's officers regarding current and future operations and financial guidance. Throughout

the investor conference, defendants misled investors regarding the Company's future cash flows

and potential cost overruns. Specifically, Defendant Anderson stated:

> The core business has been a solid source of cash flow, as I mentioned earlier. Customer advances, customer capital reimbursements did help the company in 2005 through 2008. Customer advances as you know, are generally repaid through performance. As we deliver product, we liquidate those customer advances over an agreed-to number of units and then the cash from operations 2010 to 2011 are representing the repayment of those customer advances, mainly on 787.
> . . .
> 2012 of course reflects a very different look for Spirit, right. This is where advanced payments are much lower in the current timeframe and they were spread out over more time, specifically, on 787.
> . . .
> Looking at the inventory accounts, you can see the new program investment is peaking into 2012 and 2013. We do, as we've said before, we expect some growth in 2012, coming through the different components. . . As a result, we also see the cash flow coming positive, which our guidance reflects greater than $300 million of cash from operations. If you go back to 2010, 2011 and 2012 and you adjust for some of the 787 settlements in 2010, what you see is an improvement in cash flows from 2010 and 2011 and now into 2012.
> . . .
> And then, the final business summary and we'll get to your questions. A strong long-term market, great strategic positioning; we've talked about growth. The earnings and the cash flows out of the core business will continue to strengthen as the volume grows there.
> . . .
> Sustainable cash flows is a real important goal, right, I mean we see that turning this year.
> . . .
>
> Analyst:
>
> So then if you just looked at the core, that kind of $300 million annualized implied free cash flow from the core programs, how quick do the development programs go to a net neutral position so that'll show up in the bottom line? Is that 2014, 2015?
>
> Anderson:
>
> Yeah, well, its program dependent, right. As you know, they're all at different points in the development effort. They're all at different points in the initial production phases. 787 is further along, as you saw yesterday.

28.     During the March 7, 2012 investor conference, analysts asked specific questions regarding the Company's future cost overruns of the 787 program, Terry George, the Company's VP of the 787 program assured investors that costs were under control and the program was well on its way to profitability:

> Analyst:
>
> Terry, I wondered if you might talk about the cost curve that's implied in the first 500-unit block and the sort of improvements you're planning on. When you talk about these cost improvements, like the $150,000 per unit savings from the initiative you mentioned, are those counted on in the cost curve that you guys are modeling? Or are those incremental to your planned financial performance?
> . . .
> George:
> Yes, we are-so we have a plan. We have a time line. We have a value that we need to get to on the costs. We are on that plan and it looks to me like, especially in the first block, . . . **it's promising. It's promising in terms of profitability.**

[Emphasis added.]

29.     On May 3, 2012, Spirit AeroSystems issued a press release announcing its financial and operating results for the quarter ended March 29, 2012. For the quarter, the Company reported net income of $74 million, or $0.52 diluted EPS and revenue of $1.3 billion, as compared to net income of $35 million, or $0.24 diluted EPS and revenue of $1.1 billion for the same period a year ago.

30.     On May 4, 2012, the Company filed a quarterly report for the period ended March 29, 2012 on a Form 10-Q with the SEC, which was signed by Defendant Anderson, and reiterated the Company's previously announced quarterly financial results and financial position. In addition, the Form 10-Q contained signed certifications pursuant to SOX by Defendants Turner and Anderson, stating that the financial information contained in the Form 10-Q was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On August 2, 2012, Spirit AeroSystems issued a press release announcing its financial and operating results for the quarter ended June 28, 2012. For the quarter, the Company reported net loss of $35 million, or $0.24 diluted EPS and revenue of $1.3 billion, as compared to net income of $30 million, or $0.21 diluted EPS and revenue of $1.5 billion for the same period a year ago.

32.     The statements referenced in ¶¶ 16-31 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts, which were known to defendants or recklessly disregarded by them, including that: (i) the Company was having difficulties in executing its diversification and growth strategy as it expanded its customer-base, manufacturing sites, and product design capabilities, while managing multiple development programs with significant design changes and schedule delays; (ii) the Company lacked adequate internal and financial controls; and (iii) as a result of the above, the Company's financial statements were materially false and misleading at all relevant times.

## THE TRUTH BEGINS TO EMERGE

33.     On October 25, 2012, the Company disclosed that it will recognize third quarter charges for certain new programs.  Specifically, the Company disclosed the following:

> Spirit AeroSystems Holdings, Inc. (NYSE: SPR) today announced that it expects to record pre-tax charges of approximately $184 million on the 787 program; $163 million on the G650 Wing program; $151 million on the BR725 (Engine Nacelle Package for the G650); $88 million on the G280 Wing program; and $4 million on other combined programs. These combined forward loss charges total approximately $590 million, and will be included in the company's third quarter 2012 financial results.
>
> "The execution of our diversification and growth strategy has proven very complex," said Jeff Turner, President and Chief Executive Officer, "as we

10

rapidly expanded our customer-base, manufacturing sites, and product design capabilities, while managing multiple development programs with significant design changes and schedule delays. It is unfortunate that we have struggled on these development efforts. As we move forward our focus is on applying our lessons learned in strong program management, change control, and shop floor disciplines to drive performance on these programs and continue the solid performance on our core production programs," Turner concluded.

During the third quarter, the company continued to increase production rates and progress to full-rate production on a number of newly type-certified programs. The company no longer expects to achieve cost targets sufficient to maintain zero-profit margin contracts due to increasing supply chain, factory support, and labor costs. The cash use associated with the additional contract costs will occur over the majority of remaining contract deliveries. The current contract accounting shipments are expected to be delivered by 2018.

To address the charges in the quarter, the company successfully obtained the required lender consent to amend its senior secured loan and credit facility to adjust the senior secured leverage ratio through the first quarter of 2013 and the other financial covenant ratios through the second quarter of 2013, after which time the financial covenant ratios will revert back to pre-amended ratios. The amendment is expected to become effective on or about October 26, 2012. No event of default has occurred.

Separately, the company reached a final settlement with insurers for all claims relating to the April 14, 2012 severe weather event at its Wichita, Kan. facility. The settlement amount of approximately $235 million reflects claims lower than previously estimated (approximately $400 million) and resolves all property damage, clean-up, recovery, and business interruption costs. The settlement amount less current quarter expenses will be recognized as a gain in the third quarter 2012. The cash settlement of $130 million ($235 million less the $105 million cash advance received in the second quarter 2012) is expected in the fourth quarter 2012.

34.    On October 25, 2012, the Company held a conference call to discuss the recent charges and provide an opportunity to investors to ask questions. In describing the impact of the charges on the Company's financial health, Defendant Anderson stated, "we are not achieving our cost targets in the current contract blocks as the programs move into full-rate production and

increase in production rate. These additional costs will impact cash flows over the contract block period. We expect the negative cash flow impact to be front-loaded over the next few years. . . ."

35.     During the conference call analysts voiced their concerns that the Company's previous target for positive free cash flow would be extended far into the future, and the company had failed to identify such a large write-off to investors earlier:

> Analyst:
>
> Phil, when do you hit the positive free cash flow at this point? That was supposed to be the end of this year, maybe the first quarter of next year. That's clearly off the table, so, when
>
> Analyst:
>
> **[T]he broader question, when you look at the size of this write-off, which is considerably larger than most of us had estimated, it looks like it's something like 18% to 19% of the contractual revenues in these accounting blocks. How could you have made a miss quite that big and not seen it earlier?**

[Emphasis added.]

36.     JP Morgan voiced its own skepticism regarding defendants' prior knowledge of such large write-downs and the overall impact on the Company's financial health, especially the Company's cash flows:

> Spirit will book $590 mn of forward losses in Q3. The release itself is not a total surprise, but the magnitude of the charge is as well as the inclusion of the 787 and BR725 programs in the mix. . . What we did not expect was nearly $600 mn of charges that will more than offset all of the company's earnings for the year and weigh on cash flows for 3-4 years to come. [The] 787 charge, in particular, is a surprise. The largest component of the loss Spirit announced this morning is $184 mn for the 787. We were surprised to see this since the company has made significant progress reducing 787 unit costs in recent quarters and has appeared to tout that progress on multiple occasions, including at its analyst meeting [the March 7 investor conference] in March.

37.     On this news, Spirit AeroSystems stock declined $6.55 per share or 30%, to close at $15.11 per share on October 25, 2012.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

38.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Spirit AeroSystems securities during the Class Period (the "Class"); and were damaged thereby.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

39.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Spirit AeroSystems securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Spirit AeroSystems or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Spirit AeroSystems;

- whether the Individual Defendants caused Spirit AeroSystems to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Spirit AeroSystems securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

14

- Spirit AeroSystems securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Spirit AeroSystems securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

46.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

47.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

48.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and

15

other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Spirit AeroSystems securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Spirit AeroSystems securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

49. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Spirit AeroSystems securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Spirit AeroSystems's finances and business prospects.

50. By virtue of their positions at Spirit AeroSystems, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants. Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

51.     Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of Spirit AeroSystems securities from their personal portfolios.

52.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Spirit AeroSystems, the Individual Defendants had knowledge of the details of Spirit AeroSystems's internal affairs.

53.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Spirit AeroSystems.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Spirit AeroSystems's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Spirit AeroSystems securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Spirit AeroSystems's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Spirit AeroSystems securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

54.     During the Class Period, Spirit AeroSystems securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be

disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Spirit AeroSystems securities at prices artificially inflated by defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Spirit AeroSystems securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Spirit AeroSystems securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

55.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

57.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.     During the Class Period, the Individual Defendants participated in the operation and management of Spirit AeroSystems, and conducted and participated, directly and indirectly,

in the conduct of Spirit AeroSystems's business affairs.  Because of their senior positions, they knew the adverse non-public information about Spirit AeroSystems's misstatement of income and expenses and false financial statements.

59.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Spirit AeroSystems's financial condition and results of operations, and to correct promptly any public statements issued by Spirit AeroSystems which had become materially false or misleading.

60.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Spirit AeroSystems disseminated in the marketplace during the Class Period concerning Spirit AeroSystems's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Spirit AeroSystems to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Spirit AeroSystems within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Spirit AeroSystems securities.

61.     Each of the Individual Defendants, therefore, acted as a controlling person of Spirit AeroSystems.  By reason of their senior management positions and/or being directors of Spirit AeroSystems, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Spirit AeroSystems to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Spirit AeroSystems and possessed the power to control the specific activities which

comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Spirit AeroSystems.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

## PLACE OF TRIAL

Pursuant to Local Rule 40.2, Plaintiff requests Kansas City, Kansas as the place of trial.

Dated: June 3, 2013                              Respectfully submitted,

**KENNER SCHMITT NYGAARD, LLC**

/s/ Diane A. Nygaard
Diane A. Nygaard (Kansas Bar No. 10997)
11050 Roe Ave., Suite 212
Overland Park, KS 66211
Telephone:  (913) 469-5544
Facsimile:  (816) 531-3600
E-mail: diane@ksnlegal.com

20

**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Marc I. Gross
Jeremy A. Lieberman
Lesley F. Portnoy
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665


**POMERANTZ GROSSMAN HUFFORD
DAHLSTROM & GROSS LLP**
Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184

***Attorneys for Plaintiff***