## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

WAYNE E. ANDERSON, Individually and
on Behalf of All Others Similarly Situated,

*Plaintiff,*

vs.

Case No. 13-2261-EFM-TJJ

SPIRIT AEROSYSTEMS HOLDINGS,
INC., JEFFREY L. TURNER, PHILIP D.
ANDERSON, ALEXANDER K.
KUMMANT, and TERRY J. GEORGE,

*Defendants.*

## MEMORANDUM AND ORDER

Defendants challenge whether Plaintiffs have properly pled a claim for securities fraud under the pleading standards of the Private Securities Litigation Reform Act. Plaintiffs accuse Defendants of making misleading statements that artificially inflated Spirit's stock price before Spirit recorded a $590 million forward-loss charge in 2012. To survive Defendants' motion to dismiss, Plaintiffs' consolidated complaint must properly plead that Defendants made false statements of material fact with scienter, which means having the intent to deceive or acting with recklessness. After carefully and extensively reviewing the complaint and oral argument, the Court finds that the alleged false statements were not material and that the complaint fails to raise a strong inference of scienter. Therefore, the Court grants the motion to dismiss.

## I. Factual and Procedural Background

Highly summarized, this lawsuit was filed as a class action against Spirit AeroSystems, Inc., and four corporate officers, alleging violations of federal securities laws. Specifically, this lawsuit derives from Spirit's announcement of a $590 million forward-loss charge on October 25, 2012. Under generally accepted accounting principles (GAAP), a forward-loss charge is recorded when the current estimates of total contract revenue and total contract cost indicate an entire loss on the contract. The forward-loss charge is recorded in the period in which it becomes evident.

Spirit recorded forward losses for six manufacturing contracts, including $184 million for its Boeing 787 program, $162.5 million for its Gulfstream G650 program, $151 for its Rolls-Royce BR725 program, $88.1 million for its Gulfstream G280 program, $2.4 million on its Airbus A350 program, and $2.4 million for its Boeing 747 program. The announcement caused Spirit's stock price to drop by $6.55 per share (30 percent). Spirit's quarterly report to the SEC attributed the losses to performance issues at its Tulsa facility, higher cost estimates related to type certification, the decision to delay moving work to lower-cost facilities in Kinston, N.C., and Chanute, Kan., and the finalization of supplier contracts that resulted in higher costs than originally estimated. Spirit characterizes the forward-loss charges as an unforeseen business reversal, the result of a disappointing failure to achieve planned cost reductions on Spirit's new aircraft component manufacturing contracts. Defendants maintain that the forward losses did not become evident until the third quarter of 2012.

This lawsuit was filed in June 2013. In February 2014, this Court appointed co-lead Plaintiffs, the International Association of Machinists and Aerospace Workers, District 9 Pension and Welfare Trusts and the Arkansas Teachers Retirement System. They bring this action

individually and behalf of those who acquired Spirit securities from November 3, 2011, through October 24, 2012. After this Court appointed co-lead Plaintiffs and co-lead counsel, a consolidated complaint (Doc. 49) was filed in April 2014. The consolidated complaint alleges securities fraud for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5. The picture painted by the 144-page complaint is that members of the proposed class bought Spirit stock at artificially inflated prices because of Defendants' misrepresentations and omissions of material facts related to the progress of Spirit's cost-reduction efforts from November 3, 2011, to October 24, 2012.

Plaintiffs list in the complaint 86 numbered paragraphs under the heading of "Defendants' Materially False and Misleading Statements and Omissions." The complaint attributes 28 statements to Defendant Jeffrey Turner, the chief executive officer and president of Spirit. Nineteen statements are attributed to Defendant Philip Anderson, Spirit's chief financial officer. Four statements each are attributed to Defendant Alexander Kummant, the senior vice president of Oklahoma operations, and Defendant Terry George, the vice president of Spirit's 787 program. The paragraphs are arranged as related to events during five time periods, all of which are during the class period between November 3, 2011, and October 24, 2012.

Essentially, Plaintiffs allege that Defendants falsely proclaimed success at reducing costs despite knowing that Spirit was plagued by cost overruns and production problems and failing to disclose them. Plaintiffs allege that the forward losses were evident well before the third quarter of 2012 and should have been recorded sooner instead of continuing to report zero margins. In June 2014, Defendants filed a motion to dismiss the consolidated complaint (Doc. 54) for failure to meet the pleading requirements of the Private Securities Litigation Reform Act. The Court heard oral argument in February 2015, and the matter is now before the Court.

## II. Legal standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.' "[1] " 'The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.' "[2] All well pleaded facts in the complaint are assumed to be true and are viewed in the light most favorable to the plaintiff.[3] Allegations that merely state legal conclusions, however, need not be accepted as true.[4] The court considers the complaint as a whole, "along with the documents incorporated by reference into the complaint or publicly filed with the Securities and Exchange Commission."[5]

Complaints asserting securities fraud claims are held to a higher standard of pleading beyond plausibility.[6] A plaintiff bears a heavy burden under the Private Securities Litigation Reform Act, which mandates a more stringent pleading standard for securities fraud actions.[7] To state a claim under Section 10(b) of the Securities Exchange Act of 1934,[8] a plaintiff must allege five elements:

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[2] *Brokers' Choice of America v. NBC Universal, Inc.*, 757 F.3d 1125, 1135 (10th Cir. 2014) (quoting *Peterson v. Grisham*, 594 F.3d 723, 727 (10th Cir. 2010)).

[3] *See Zinermon v. Burch*, 494 U.S. 113, 118 (1990).

[4] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[5] *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1146 (10th Cir. 2015).

[6] *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14 (2007).

[7] *Weinstein v. McClendon*, 757 F.3d 1110, 1112 (10th Cir. 2014).

[8] 15 U.S.C. § 78j(b).

(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.[9]

The statutory language of the Private Securities Litigation Reform Act requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[10] The complaint also must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which, in this case, is with scienter or, in other words, with intent to defraud or recklessness.[11] A complaint alleging fraud also must satisfy Federal Rule of Civil Procedure 9(b), which requires that the plaintiff "must state with particularity the circumstances constituting fraud or mistake."[12] That means that such a complaint "must identify the time, place, and content of the allegedly fraudulent representation, identify the person responsible for it," and identify its consequences.[13] In other words, Rule 9(b) requires that a complaint include the "who, what, when, where and how" of the fraud alleged.[14]

---

[9] *Weinstein*, 757 F.3d at 1112-13.

[10] 15 U.S.C. § 78u-4(b)(1).

[11] 15 U.S.C. § 78u-4(b)(2)(A).

[12] Fed. R. Civ. P. 9(b).

[13] *Simmons Invs., Inc. v. Conversational Computing Corp.*, 2011 WL 673759, at *6 (D. Kan. Feb. 17, 2011).

[14] *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 726-27 (10th Cir. 2006) (internal quotation marks omitted).

### III. Analysis

Section 10(b) of the Securities Exchange Act of 1934, found at 15 U.S.C. § 78j(b), and Rule 10b-5, found at 17 C.F.R. § 240.10b-5, prohibit fraudulent acts involving securities transactions. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe."[15] Rule 10b-5, prescribed by the Securities Exchange Commission, specifically makes it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the purchase or sale of any security."[16] Plaintiffs also seek to hold each Defendant liable under Section 20(a), found at 15 U.S.C. § 78t(a), which holds each person who controls any person liable for securities fraud jointly and severally liable to the same extent as the controlled person.[17]

Spirit challenges whether the complaint has pled facts showing falsity, materiality, and scienter. Spirit argues that the statements are not false or misleading. Second, Spirit argues that the allegedly untrue statements are not material because statements of corporate optimism and forward-looking statements are not actionable. Further, Spirit argues that Plaintiffs do not plead facts demonstrating a strong inference of the required state of mind, or scienter, either with intent to defraud or recklessness. Overall, Spirit argues that Plaintiffs' have pled fraud by hindsight, which is not enough to show a strong inference of fraud.

---

[15] 15 U.S.C. § 78j(b).

[16] 17 C.F.R. § 240.10b-5.

[17] 15 U.S.C. § 78t(a).

**A. Whether the Complaint Alleges False and Misleading Statements**

The first issue is whether Plaintiffs have properly alleged that Defendants made false and misleading statements. The complaint sets out more than 40 allegedly misleading statements and specifies why the statements are claimed to be misleading in paragraphs 62, 74, 94, 111, and 131. The complaint points to statements made in earnings releases and conference calls related to the third quarter of 2011, the fourth quarter of 2011, the first quarter of 2012, and the second quarter of 2012 in addition to statements made at the 2012 investor conference. The complaint also identifies the consequences of each group of statements: an allegedly inflated stock price that went up after each event. In other words, the complaint identifies the time, place, and content of the alleged false statements, identifies the person responsible for each one, and identifies the consequences.[18]

The complaint must state the reasons why the statements are misleading.[19] A plaintiff must "identify in the complaint specific facts that support the allegations about the misleading nature of the defendants' statements."[20] The statute requires that the complaint "state with particularity all facts on which that belief is formed."[21] A statement may be deemed false, for the purpose of an allegation surviving a motion to dismiss, if a reasonable person would understand that a statement is inconsistent with the facts on the ground.[22]

---

[18] *See Simmons*, 2011 WL 673759, at *6.

[19] *In re Level 3 Comms., Inc. Sec. Litig.*, 667 F.3d 1331, 1341 (10th Cir. 2012).

[20] *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1098 (10th Cir. 2003).

[21] 15 U.S.C. § 78u-4(b)(1).

[22] *Level 3*, 667 F.3d at 1343.

Here, most of the statements alleged to be false are statements related to Spirit's ability to achieve cost reduction goals on the Boeing and Gulfstream programs made while there were undisclosed ongoing problems that led to severe cost overruns. Regarding the Boeing and Gulfstream programs, Plaintiffs allege that Defendants repeatedly assured investors that the projects were "on track," "tracking per plan," "going really well," "really screaming down the cost curves," and that "cost reduction is right on plan" and allege that these statements were false when made.

In paragraph 62 of the complaint, Plaintiffs allege that Defendants had already understated costs by 16 percent at the time they made positive statements about the Boeing 787 program in November 2011. Plaintiffs allege that Defendants failed to account for these cost overruns in the third quarter of 2011 so that they could artificially report a zero margin and avoid recording a forward loss on the 787 and Gulfstream projects. Paragraph 74 outlines similar allegations about statements made in February 2012. For example, Plaintiffs allege that Anderson stated that Spirit was making "good progress on 787 cost reduction initiatives," which was inconsistent with internal cost analysis at the time. Plaintiffs make similar allegations in paragraph 94 about statements made in March 2012, in paragraph 111 about statements made in May and June 2012, and in paragraph 131 about statements made in September 2012. Plaintiffs allege that Defendants "lacked a reasonable basis for their positive statements" about Spirit and its outlook.

For the purpose of this motion, the Court assumes that Plaintiffs have sufficiently pled false and misleading statements to survive dismissal on this issue. The next question is whether any of these statements concerned a material fact or if a material fact necessary to make any of the statements not misleading was omitted, as required by Rule 10b-5.

**B. Whether Misstatements and Omissions Are Material**

A statement or omission is material "if a reasonable investor would consider it important in determining whether to buy or sell stock."[23] The Tenth Circuit has recognized at least two categories of statements that generally will not be considered material: first, vague statements of corporate optimism, and second, forward-looking statements that are accompanied with sufficient cautionary language that nullify any potential misleading effect.[24] But statements of corporate optimism and forward-looking statements may be material if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact.[25]

The Tenth Circuit has concluded that statements that are "mere puffing [and] not capable of objective verification" are immaterial as a matter of law.[26] Statements not capable of objective verification are immaterial as a matter of law because "reasonable investors do not rely on them in making investment decisions."[27] But it is possible for some statements to "cross the line from corporate optimism and puffery to objectively verifiable matters of fact."[28] Examples of statements capable of objective verification include terms that are measurable, such as "majority of," "90% done," or "most of."[29] Also immaterial as a matter of law are broad optimistic claims that are so vague and lacking in specificity that no reasonable investor could find them

---

[23] *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997).

[24] *Id.* at 1119-20.

[25] *Id.* at 1120, n.6 (citing *Virginia Bankshares v. Sandberg*, 501 U.S. 1083, 1093-94 (1991)).

[26] *Level 3*, 667 F.3d at 1339 (quoting *Grossman*, 120 F.3d at 1119).

[27] *Id.*

[28] *Id.* at 1340.

[29] *See id.* at 1340-41.

important.[30] Examples of these "rosy affirmations" include statements that certain efforts are "progressing well" or "tracking within expectations."[31] Materiality is generally a fact-specific inquiry for a jury, but courts do not hesitate to dismiss securities claims if the representation is plainly immaterial.[32]

Here, the complaint highlights more than 40 positive statements that Plaintiffs argue are false and misleading.[33] Paragraphs 62, 74, 94, 111, and 131 of the complaint emphasize these phrases, which are bolded here in the context presented in the complaint as attributed to each defendant. The complaint lists the false and misleading statements as included in the following 27 paragraphs:

¶51(a): During his opening statement, Turner highlighted the "efforts to implement cost improvements on the 787" touting "the joint Boeing and Spirit teams are **tracking per plan** to identify and implement cost improvements, across the program on the current product structure, its producibility, efficiency, and productivity." (Turner, Nov. 3, 2011 conference call)

¶51(b): "Looking ahead, we expect to continue to benefit from the expanding demand for commercial aircraft, while achieving **productivity and efficiency improvements** across our business." (Turner, Nov. 3, 2011 conference call)

¶51(d): Turner stated: "We don't have any big major tent poles, that we are worried about right now," adding "our **condition of assembly** is **extremely good**." (Turner, Nov. 3, 2011 conference call)

¶51(e): Speaking very positively about the Gulfstream programs, Turner noted: "**I like the momentum that I'm seeing**. I will speak a little bit about the 280, specifically, and the 650, which you guys know, have been challenging programs for us. We've got—I like the momentum that I see, I like the

---

[30] *See id.* at 1340.

[31] *See id.*

[32] *Grossman*, 120 F.3d at 1118.

[33] Consolidated Complaint, Doc. 49, ¶62(b)-(d), ¶74(b)-(d), ¶94(b)-(d), ¶111(b)-(d), ¶131(b)-(d).

management team we have in place. I think we've **seen major improvements in flow**, on the 280." (Turner, Nov. 3, 2011 conference call)

¶54: Turner also touted the 280 and 650 programs, noting that "[t]he Gulfstream programs continue their progress, as we build the initial production wings for the G280 and G650," and emphasized that "we are **seeing growing tailwinds**." (Turner, Nov. 30, 2011 investors conference)

¶55: "The 787, as you know, we've set the first block of 500 units of that at a **zero margin**. At this point in time, we've reserved—have a **healthy management reserve** on that and have focused activity to bring—to come down the cost curve on that program. If we achieve that cost curve, we will be able to convert some of that management reserve into profitability. If we don't achieve that, that cost curve, we'll have some management reserve to **cushion** it.

"[C]learly we believe the **tailwinds** are stronger now than the headwinds and we've got the opportunity to have an expansion—or expanding topline and be able to hold or improve our margins overall." (Turner, Nov. 30, 2011 investors conference)

¶57: Touting the Tulsa facility, where the Gulfstream and 787 wing programs were located, Turner assured the market that he was "**very pleased with my Tulsa team**, the operations team there, **and the progress they're making in the factory**." (Turner, Nov. 30, 2011 investors conference)

¶65(a): Anderson confirmed that Spirit had "made **good progress on 787 cost reduction initiatives**." (Anderson, Feb. 9, 2012 conference call)

¶65(c): Anderson then assured investors that the headwinds experienced in Spirit's development programs in 2011 would not be present, explaining that "we had some bigger challenges [in 2011], obviously. **At this point, there is nothing that tells us** those **are going [to] repeat**." One of the call participants confirmed: "So in other words you have derisked enough" on the development programs. Anderson also confirmed that "[o]**ur progress on 787 has been very, very good**," and assured that for 2012, "[n]o there's really no anomalies. Nothing stands out that we should talk about." (Anderson, Feb. 9, 2012 conference call)

¶65(d): With respect to the state of the 280 and 650 programs, Turner explained: "I will say that our operations tempo is improving. **Inside the factory is becoming more stable**. We are adding some support and some labor as needed as we come up the curve in terms of higher rates, working very closely with the customer. . . . Inside our factory is **progressing well**; **we are smoothing out the supply chain**, there has been some issues there as there are on almost all new development programs." (Turner, Feb. 9, 2012 conference call)

¶69: Discussing the state of the Gulfstream programs, Anderson explained that "the 650 to 280 designs are firming up nicely where now we **have a much better view of the bill of material**." And, acknowledging past problems with the Gulfstream programs in Tulsa, Anderson assured investors that "**a lot of the risk looks like it's behind us**." (Anderson, Feb. 22, 2012 investors conference)

¶77: Focused on Spirit's zero margin and deferred inventory balances for the 787 program, investors were assured by Anderson that on the "787, you've seen the improvement we're making there (on the 787) and those deferred balances. . . . [W]e're very much on plan where we expected to be, but it's a big, challenging program given it's been as late as it is, but we feel good about where we're at.

"There's 787, right, which is a big, big volume growth and today's **we're booking** that **at zero gross margins and we're making good progress**, but the challenge still remains." (Anderson, March 6-7, 2012 investor conference)

¶82: "I just need to leave you with the feeling that the plant floor rhythm is entirely different. So **we're truly making progress** there **on both programs**. . . . [W]e **are certainly happy with what we're achieving on the plant floor**." (Kummant, March 6-7, 2012 investor conference)

¶84: With respect to the 650 program, Kummant assured investors that "[w]e are in a completely different operational rhythm than [the Oklahoma facilities] were a year ago," explaining that "we feel like **we've made tremendous progress [on the G650]**." (Kummant, March 6-7, 2012 investor conference)

¶86: George then assured investors that the 787 cost curve was "**pretty good-looking**." (George, March 6-7, 2012 investor conference)

¶87: "When I think about our production system, again, internally I'm thrilled with the way that we're stepping up in rate. I **don't have any concerns with our supply base**." (George, March 6-7, 2012 investor conference)

¶93: The Letter to Shareholders touted the Company's progress with respect to the "ramp-up" of the 787 program, explaining: "**Our strong production program base has allowed us to successfully weather significant program delays and overlapping new program development timelines that strained resources.**" (Turner, March 28, 2012 letter to shareholders)

¶100: During his opening statement, Turner emphasized that "the joint Boeing and Spirit **teams continue to track per plan** to identify and implement cost improvements across the (787) program through value engineering, supply chain architecture, and production flow." (Turner, May 3, 2012 conference call)

¶101: Responding to questions regarding the margin and risk profiles for Spirit's 787 program, Anderson explained that Spirit was "**on plan as of the end of the first quarter here in 2012**." Defendants' praise of the 787 program continued as Anderson "echo[ed]" analyst sentiment that "the per production cost on 787, obviously nice progress there," stating "[i]t is very good progress." Anderson continued, "We are very pleased with where we are right now. . . . And we are very happy with how it is going. We are just going to **continue to execute our plan**. We certainly talked about 125 or in that range. We are working hard to beat that, I can assure you. . . . **We are happy with our progress both in Wichita and in Tulsa**. . . ." (Anderson, May 3, 2012 conference call)

¶104: Anderson ended the investor conference call by reinforcing an analyst's observation that the "787 is obviously coming in pretty well," stating simply: "**787 is doing well**." (Anderson, May 3, 2012 conference call)

¶107: Turner also addressed analyst's concerns about the G650 program, declaring: "So I mean **I'm very bullish on the G650**. **Our production line is running smoothly** on that and I think making some significant progress." (Turner, June 13, 2012 investors conference)

¶108: "We certainly **have a good chance of converting** some of what we have in the **reserve into profitability**." (Turner, June 13, 2012 investor conference)

¶115: Turner continued, touting that "[d]uring the [second] quarter, the [wing] segment made progress on enhanced production plans, . . . with **improved production flow for our G280 and G650 programs in our Tulsa facility**." (Turner, Aug. 2, 2012 conference call)

Anderson then remarked that "787 deferred inventory growth rates continued to moderate as we **continue to improve our unit cost performance, as planned**." (Anderson, Aug. 2, 2012 conference call)

¶116: In response, Turner stated: "Well Carter, I think we—I mean, **we clearly came through the quarter without additional issues**. . . . In both [the 280 and 650], as I think I've mentioned for the last couple quarters, we are **making substantial improvements in our cost curves**. . . . Good progress, **really screaming down the cost curves on both programs**, and feeling better about it. . . ." (Turner, Aug. 2, 2012 conference call)

¶118: Anderson stated: "I'm not going to answer," but assured the analyst that "**[w]e are continuing to improve**, that's the good news, right? . . . **[W]e feel really good about the plan we're on**." (Anderson, Aug. 2, 2012 conference call)

¶123: "We anticipate **we will continue to track that curve**. . . . [W]e are making some progress, and I think we're not going to flatten. **We're going to keep coming down the curve**." (Turner, Aug. 7, 2012 investor conference)

¶129: During the conference, Anderson discussed the progress made on the 787 program's cost curve, explaining "so far—**so far so good**. . . . But we are seeing improvement across all of our products on 787 and continue to have a level of optimism that we will be able to come down the curve." (Turner, Sept. 13, 2012 investor conference)[34]

The Court finds that none of these statements are capable of objective verification. Specifically, none of these statements include measurable terms that can be objectively disproven. Most of the statements may be characterized as vague statements of corporate optimism and three of them may be characterized as forward-looking statements. Specifically, 11 of these paragraphs refer to varying degrees of making progress and four others are variations of statements that certain programs are "tracking per plan" or "on plan." These are the types of rosy affirmations that have been held immaterial as a matter of law in the Tenth Circuit.[35]

Plaintiffs, instead, seem to base their argument on the assertion that Defendants lacked a reasonable basis in fact to make these positive statements when they made them. This Court has noted that statements of corporate optimism may be material "if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact."[36] Indefinite and unverifiable conclusory statements may be misleading without a factual basis that justifies them

---

[34] Consolidated Complaint, Doc. 49, p. 21-63 (altering typeface to reflect statements identified in paragraphs 62(b)-(d), 74(b)-(d), 94(b)-(d), 111(b)-(d), and 131(b)-(d) as false and misleading).

[35] See *Level 3*, 667 F.3d at 1340.

[36] *Simmons*, 2011 WL 673759, at *5.

as accurate.[37] In most cases where optimistic statements have been found to be actionable, "courts also have found accompanying omissions of material fact."[38]

Specifically, an omission is material if there is a "substantial likelihood that the disclosure of an omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[39] However, there is no affirmative duty to disclose any and all material information under § 10(b) and Rule 10b-5(b).[40] Silence is not misleading under Rule 10b-5 unless there is a duty to disclose.[41] Disclosure is required under this rule only when necessary "to make the statements made, in the light of the circumstances under which they were made, not misleading."[42] For example, "if a defendant makes a statement on a particular issue, and that statement is false or later turns out to be false, the defendant may be under a duty to correct any misleading impression left by the statement."[43] On the other hand, a statement may be too vague and indefinite to give rise to such a duty to disclose.[44] A duty to disclose only exists if "both the statement made is material, and the omitted

---

[37] *Virginia Bankshares*, 501 U.S. at 1093 ("Provable facts either furnish good reasons to make a conclusory commercial judgment, or they count against it, and expressions of such judgments can be uttered with knowledge of truth or falsity just like more definite statements.").

[38] *In re  Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1217 (D. Kan. 2002).

[39] *Matrixx Initiatives, Inc. v. Siracusano*, 131 S.Ct. 1309, 1318 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988)).

[40] *Id.* at 1321.

[41] *Basic Inc.*, 485 U.S. at 239 n.17.

[42] 17 C.F.R. § 240.10b-5(b).

[43] *Grossman*, 120 F.3d at 1125; *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading.").

[44] *See Grossman*, 120 F.3d at 1125 (agreeing that statement that merger would not dilute "future earnings" was too vague and indefinite to give rise to a duty to disclose actual earnings forecasts before actual earnings were known).

fact is material to the statement in that it alters the meaning of the statement."[45] In short, companies can control what they must disclose by controlling what they say to the market, even about information that a reasonable investor might consider material.[46]

Here, the complaint repeatedly alleges that the defendants failed to disclose that "the Company's 787 and Gulfstream programs were experiencing rampant and ongoing production problems, leading to severe current and projected cost overruns, which defendants concealed in an effort to artificially maintain zero margin on the 787 and avoid taking a forward loss on it and the Gulfstream programs."[47] The question is whether Defendants had a duty to disclose information about production problems and cost overruns. Such a duty must be tied to a material statement that would be misleading without such a disclosure.

The Court finds that Defendants had no duty to disclose the information about rampant production problems and cost overruns because they did not make any materially misleading statements that would give rise to such a duty.[48] As noted earlier, the alleged misstatements identified by Plaintiffs are too vague to qualify as material and cannot be objectively verified. Plaintiffs fail to tie the alleged omissions to a material statement that would be misleading without the disclosure of production problems and cost overruns. Without the benefit of guidance from the Plaintiffs, the Court is left to guess which statements related to production and costs

---

[45] *McDonald v. Kinder-Morgan, Inc.*, 287 F.3d 992, 998 (10th Cir. 2002) (quotations omitted).

[46] *Matrixx Initiatives*, 131 S.Ct. at 1322; *Time Warner*, 9 F.3d at 267 ("[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know the fact. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts.").

[47] Consolidated Complaint, Doc. 49, at ¶62, ¶74, ¶94, ¶111, ¶131.

[48] *See Grossman*, 120 F.3d at 1119; *In re Yum! Brands, Inc. Sec. Litig.*, --- F. Supp. 3d ---, 2014 WL 7359168, at *14 (W.D. Ky. Dec. 24, 2014) (noting that "no duty to disclose arises from disseminating immaterial or non-misleading information").

trigger a duty to disclose contrary information. Statements that Spirit made "good progress on 787 cost reduction initiatives" and that Spirit is "making substantial improvements in our cost curves" seem to acknowledge that costs were an issue but are too vague and indefinite to trigger a duty to disclose contrary information. It is also not clear what concrete contrary information—beyond vague "production problems" and "cost overruns"—Plaintiffs allege that Defendants should have disclosed. According to the Plaintiffs' own complaint, the average cost per unit for the 787 and Gulfstream 650 decreased each quarter.[49] So it is not clear that statements touting progress and improvement on cost-reduction efforts were false statements, let alone materially false statements.

To summarize, the Court finds that Plaintiffs have failed to show that Defendants made a material misstatement because the statements Plaintiffs identify are too vague to be material and cannot be objectively verified. The Court further finds that Plaintiffs have failed to show that Defendants omitted any material fact because Defendants did not make a material statement that triggered a duty to disclose contrary information. Therefore, the Court grants Defendants' motion to dismiss because Plaintiffs have failed to show materiality. But even if the Court found otherwise, Plaintiffs' complaint still fails because it fails to raise a strong inference of scienter.

## C. Whether the Complaint Raises a Strong Inference of Scienter

The Private Securities Litigation Reform Act requires that a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[50] The required state of mind is referred to as scienter, meaning the intention to deceive,

---

[49] Consolidated Complaint, Doc. 49, p. 91-92, tables 2-3.

[50] 15 U.S.C. § 78u-4(b)(2)(A).

manipulate, or defraud.[51] The Tenth Circuit also recognizes recklessness within the definition of scienter.[52] Recklessness has been described as a lesser form of intent.[53] The Tenth Circuit has defined recklessness in this context as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or so obvious that the actor must have been aware of it."[54] This means a state of mind beyond gross negligence and closer to conscious disregard.[55] For example, a disregard of the most current factual information before making statements can support a finding of recklessness.[56]

This pleading standard requires the court to account for plausible opposing inferences.[57] A complaint avoids dismissal "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[58] This requires a comparative evaluation of inferences urged by the plaintiff and of competing inferences rationally drawn from the facts alleged in the complaint.[59] This means that the inference that the defendant acted with scienter does not need to be irrefutable, backed by

---

[51] *Tellabs*, 551 U.S. at 313.

[52] *In re Gold Res. Corp. Sec. Litig.*, 776 F.3d 1103, 1112-13 (10th Cir. 2015)

[53] *Dronsejko v. Thornton*, 632 F.3d 658, 668 (10th Cir. 2011) (citing *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 n.7 (6th Cir. 1999)).

[54] *Level 3*, 667 F.3d at 1343 n.12 (quoting *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001)).

[55] *Id.*

[56] *Id.* at 1345 (citing *Frank v. Dana Corp.*, 646 F.3d 954, 959 n.2 (6th Cir. 2011)).

[57] *Matrixx*, 131 S.Ct. at 1324.

[58] *Id.* (quoting *Tellabs*, 551 U.S. at 324).

[59] *Tellabs*, 551 U.S. at 314.

-18-

smoking-gun evidence, or even the most plausible of the two inferences.[60] But the inference of scienter must be more than merely "reasonable" or "permissible." It must be "cogent and compelling, thus strong in light of other explanations."[61]

The court must accept all factual allegations in the complaint as true and must construe them in the light most favorable to the plaintiff.[62] The court must review all the allegations holistically, and the absence of a motive allegation, though relevant, is not dispositive.[63] According to the U.S. Supreme Court, the court must ask: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"[64] If both inferences appear to be comparatively equal, then the complaint sufficiently pleads scienter.[65] In other words, a tie goes to the plaintiff.

Here, Defendants urge for a collective inference that they used their best efforts and good judgment to estimate the future profitability of these contracts before reaching the conclusion that Spirit would have to declare losses on them. Specifically, Defendants maintain that Spirit suffered a number of serious, unanticipated setbacks on these contracts in the third quarter of 2012, causing it to reevaluate its profitability estimates. Spirit's position is that after concluding its third quarter cost estimate reviews, the company determined that it could not achieve some of its planned cost reductions and promptly notified investors that it was recognizing a substantial

---

[60] *Id.* at 324.

[61] *Id.*

[62] *Gold Res.*, 776 F.3d at 1108.

[63] *Matrixx*, 131 S.Ct. at 1324.

[64] *Tellabs*, 551 U.S. at 326.

[65] *See Jayhawk Capital Mgmt., LLC v. LSB Indus., Inc.,* 2009 WL 3766371, at *14 (D. Kan. Nov. 10, 2009).

loss on the contracts. Defendants characterize these events as straightforward performance issues that first arose during the third quarter of 2012. Defendants characterize Plaintiffs' allegations as fraud by hindsight, which is nothing more than alleging that Defendants must have known all along that the costs on these programs were underestimated.

Plaintiffs' response characterizes the situation as: "Spirit grossly underbid its three most important and valuable design contracts with Gulfstream and Boeing, committed itself to highly unfavorable contracts, and fell into a worsening spiral of production problems and cost overruns" and "hid those problems and losses from investors."[66] Plaintiffs argue that the complaint raises a strong inference of intent to deceive, manipulate, or defraud or recklessness. Plaintiffs argue that this inference is supported by six factual explanations: 1) Spirit's production problems, 2) corroborating witness accounts, 3) the magnitude of the understated costs, 4) the GAAP violations and public-disclosure certifications, 5) Defendants' admissions after October 25, 2012, and 6) Defendants' motive. Plaintiffs emphasize that all these facts, taken collectively, give rise to a strong inference of scienter and should not be scrutinized in isolation from each other.

**1. Context of Defendants' Statements Undercuts Finding of Recklessness**

Even if Plaintiffs properly pled that there were false or misleading statements of material fact, it does not automatically follow that scienter has been properly pled. It is not enough for a plaintiff to show false or misleading statements of material fact.[67] Whether a complaint raises a strong inference of scienter is an entirely different question. However, there is a connection between the extent to which omitted information is material and the question of whether a

---

[66] Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, Doc. 58, p. 1.

[67] *Level 3*, 667 F.3d at 1343 (holding that company officers made materially false statements but investors failed to establish strong inference of scienter).

plaintiff has pled facts supporting a strong inference of scienter.[68] Specifically, if it is questionable whether an omitted fact is material or its materiality is marginal, that undercuts the argument that Defendants acted with recklessness in not disclosing the fact.[69]

To meet the recklessness standard to establish scienter in a securities fraud case alleging non-disclosure of material facts, the facts must be "so obviously material that the defendant must have been aware both of its materiality and that its non-disclosure would likely mislead investors."[70] As discussed earlier, even if the Court found that Defendants had made materially false statements—which it declined to do—the materiality would have been marginal at best. Also cutting strongly against a finding of recklessness—and thus scienter—is the fact that much of the information about the risk of recording a forward-loss charge that Plaintiffs claim was concealed was actually reported. These disclosures were omitted from the complaint.

For example, Plaintiffs call attention to Turner's August 2, 2012 statement that Spirit was "really screaming down the cost curves on both (Gulfstream) programs."[71] The complaint summarizes the context of the statement as follows:

> During the question and answer portion of defendants' presentation, Turner discussed the "*substantial improvements*" in the 280 and 650 cost curves and addressed a BB&T analyst's inquiry that "All quiet on the G280 front in this quarter. Should we assume that, that program is mostly de-risked?" In response, Turner stated: "Well Carter, I think we—I mean, *we clearly came through the quarter without additional issues*. . . . In both [the 280 and 650], as I think I've mentioned for the last couple quarters, *we are making substantial improvements in our cost curves*. . . . *Good progress, really screaming down the cost curves on both programs, and feeling better about it*. . . ."[72]

---

[68] *Fire and Police Pension Ass'n of Colo. v. Simon*, 778 F.3d 228, 242 (1st Cir. 2015).

[69] *Id.*

[70] *Fleming*, 264 F.3d at 1261.

[71] Consolidated Complaint, Doc. 49, ¶116.

[72] Consolidated Complaint, Doc. 49, ¶116.

But the actual context of the statement, filling in the gaps, was as follows:

> Well, Carter, I think we—I mean, we clearly came through the quarter without additional issues. As we've been saying, and I continue to say and our filings all point to, I mean, the—*this is a risky program*. We're—let me just talk about it and the G650. In both cases, as I think I've mentioned for the last couple of quarters, we are making substantial improvements in our cost curves. Frankly, I'd like to see a little more efficiency as we came down those curves. We're very close to meeting the curves that we placed but are not quite meeting them yet. *We still got risk, as we've said, on it with some of our supply chain.* I think our design activities have settled down and now we've got to go make sure those supply chains are strong and cost effective. *So there remains risk on those programs*, but I like the momentum and the trajectory, and it's just a question of whether we'll meet all the objectives we've set or how close we'll come to them or if in fact we'll be able to do a little better than we've put in the window. But good progress, really screaming down the cost curves on both programs and feeling better about it. *But again, and we've said all along, we've got aggressive targets on those programs and risk remains.*[73]

So in the same breath that Turner expressed corporate optimism about improvements in the cost curves, four times he also warned that risk remains. In context, it is clearer that Turner's answer to the analyst's question is "no," the program was not "de-risked." But Plaintiffs' edited version gives the impression that Turner answered the question "yes," there was no more risk.

At oral argument, Plaintiffs asserted that the August 2, 2012 statements about "making substantial improvements in our cost curves" and "really screaming down the cost curves on both programs" contradicted a later admission that Spirit began a cost recovery plan in late July 2012. Plaintiffs argue that the positive statements about the cost curve triggered a duty to disclose the new recovery plan.

Again, the context of the statements fails to show a contradiction. As indicated above, Turner's statements about the improving cost curves expressly concerned the Gulfstream 280

---

[73] Spirit Q2 2012 Earnings Call Transcript, Doc. 55-16, p. 4 (emphasis added).

and 650 programs. Spirit's 2012 annual report to the SEC, as quoted in the complaint, included the following statements about the Boeing 787 program:

> The performance issues at the Tulsa facility were magnified in the third quarter of 2012 when the Company implemented a recovery plan which would bring the Company current on the delivery schedule for its B787 wing components. The Company began implementing the recovery plan during late July 2012 which resulted in the addition of significant additional resources to meet delivery schedules.[74]

The context shows that the recovery plan expressly related to the Boeing 787 program. The report does not indicate that the recovery plan was for the Gulfstream 280 and 650 programs. Therefore, the statements about the cost curves for the Gulfstream programs did not trigger a duty to disclose a recovery plan for the Boeing 787.

Five days after the August 2 statements, Spirit's quarterly report to the SEC included the following statements that recognized the risk of forward-loss charges in the near future:

● "These new programs continue to pose a risk of additional charges and/or forward-loss given the low margins that are currently forecasted due to cost pressures."[75]

● "Contract estimates are expected to remain at break-even margins until we are able to realize these important cost reduction opportunities. If we are unable to realize these expected cost savings, future forward-losses on this contract may be recognized."[76]

● "The next twelve months will be a critical time for most of these development programs as we manufacture the initial units and establish baseline performance for the recurring

---

[74] Consolidated Complaint, Doc. 49, ¶ 146.

[75] Spirit Quarterly Report, Doc. 55-12, p. 3.

[76] Spirit Quarterly Report, Doc. 55-12, p. 4.

cost structure. Recognition of forward-losses in future periods continues to be a significant risk and will depend upon several factors."[77]

Similarly, Plaintiffs characterize Turner as assuring the market by touting the Tulsa facility with his statement that he was "very pleased with my Tulsa team, the operations team there, and the progress they're making in the factory" during a November 30, 2011 investors conference. However, the full context of the statement revealed that this optimism was couched:

> The G650 and the G280 have been selling well and for there, it's very much for us we are working to catch up and to meet rate in a rate buildup and *either one of those by themselves is somewhat challenging, doing both catching up and speeding up at the same time put extra challenges on us*. I'm very pleased with my Tulsa team, the operations team there, and the progress they're making in the factory, but *I'm still worried about our ability to make that rate*. And frankly, so is my customer.[78]

Referencing a conference call earlier that same month, Plaintiffs characterize one statement in particular as Turner speaking "very positively about the Gulfstream programs."[79] Plaintiffs accurately quote Turner as liking "the momentum that I'm seeing" and "major improvements in flow on the 280," but the complaint omits a key caveat at the end of the statement.[80] Turner concluded, "I think we'll see continued improvement through time on those programs. The real issue is the amount of money that we've spent over in the development and trying to earn some of that back, whether we'll be able to do that or not."[81] In addition, Spirit's annual report to the SEC in February 2012 reported challenges in the 787 program and

---

[77] Spirit Quarterly Report, Doc. 55-12, p. 4.

[78] Spirit Conference Call Transcript, Doc. 55-3, p. 4 (emphasis added).

[79] Consolidated Complaint, Doc. 49, ¶51(e).

[80] Consolidated Complaint, Doc. 49, ¶51(e).

[81] Spirit Q3 2011 Earnings Call Transcript, Doc. 55-14, p. 8.

-24-

recognized that "if we are not able to achieve the cost reduction plan or successfully negotiate through the annual price adjustment, we could eventually need to recognize a forward-loss in our current contract accounting block."[82]

In addition to considering the complaint as a whole, it is appropriate for the Court to review the documents cited in the complaint and those publicly filed.[83] Such a review of the context of the statements cited in the complaint shows that Defendants consistently warned the public of the possibility of recognizing the forward losses that they eventually announced in October 2012. The point is not to assess the adequacy of the disclosures or to assess their sufficiency as cautionary statements that would negate materiality. Rather, these illustrations cut against finding that Defendants acted with recklessness, which the Tenth Circuit has defined as "conduct that is an extreme departure from the standards of ordinary care."[84] As discussed earlier, Defendants were under no duty to disclose the intricate details of Spirit's alleged production problems and cost overruns.

Defendants often hedged their optimism, in conference calls and SEC reports, by acknowledging challenges and placing investors on notice of the imminent risk of taking forward-loss charges on the 787 and Gulfstream programs. This is far from "conduct that is an extreme departure from the standards of ordinary care" or anything close to "conscious disregard."[85] Disclosures such as these cut against a strong inference that Defendants were

---

[82] Spirit Annual Report, Doc. 55-6, p. 9.

[83] *See Nakkhumpun*, 782 F.3d at 1146.

[84] *Level 3*, 667 F.3d at 1343 n.12 (quoting *Fleming*, 264 F.3d at 1260).

[85] *See id.*

attempting to hide information or mislead the public. As a result, the Court finds that the context of these statements undercuts any inference of recklessness.

## 2. Lack of Compelling Motive Also Undercuts Finding of Scienter

Also undercutting any inference of scienter is the lack of a compelling motive for Defendants to conceal production problems and delay taking the forward-loss charges. A complaint is not required to demonstrate a specific motive to meet the pleading standards of the Private Securities Litigation Reform Act.[86] But motive may contribute to the totality of the pleadings.[87] The Tenth Circuit has concluded that motive alone is not typically sufficient to establish a strong inference of scienter, but allegations of motive may be important to the totality of the pleadings to determine whether the allegations lead to a strong inference of fraudulent intent.[88] On the other hand, the absence of a motive—while not dispositive—is relevant and may count against a finding of scienter.[89]

Here, Plaintiffs allege that Defendants were motivated to deceive investors:

(i) in order to artificially preserve Spirit's investment grade credit and avoid triggering Spirit's loan covenants; (ii) by Spirit's 'at-risk' compensation structure, which based an enormously high percentage of the individual defendants' annual compensation (sometimes upwards of 80%) on Individual and Company performance; and (iii) to retain their executive positions and collect millions in bonus awards.[90]

---

[86] *See Adams*, 340 F.3d at 1105-07.

[87] *See Pirraglia v. Novell, Inc.,* 339 F.3d 1182, 1191 (10th Cir. 2003).

[88] *See Fleming*, 264 F.3d at 1261-62.

[89] *Level 3*, 667 F.3d at 1347.

[90] Lead Plaintiffs' Opposition to Defendants' Motion to Dismiss the Consolidated Complaint, Doc. 58, p. 49.

Generally, motive entails "concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged."[91] While motive of personal financial gain may weigh heavily in favor of an inference of scienter, the lack of any allegation of a financial benefit weighs against it.[92] Further, a generalized motive shared by all companies and not uniquely related to Spirit in particular cannot by itself sustain a claim of securities fraud.[93] This applies to the Plaintiffs' first alleged motive.[94] And incentive-based compensation "is common among executives at publicly traded companies and does not ordinarily indicate scienter."[95] Likewise, job protection and potential bonuses have been found to be insufficient motives to support scienter because they are motives shared by all company executives.[96]

Here, it is not clear what Spirit or the individual defendants had to gain by delaying the recording of the forward-loss charges to October 2012. As it turned out, the complaint reports that Spirit's stock price plummeted immediately and Turner announced his resignation from the company shortly after the October 2012 announcement. Presumably, those same things would have happened even if Spirit had recorded the same forward-loss charges earlier as Plaintiffs contend it should have done. Therefore, the Court finds the motives attributed to Defendants not unique or compelling, finds that the lack of a compelling motive is relevant, and finds that it counts against a finding of scienter.

---

[91] *Fleming*, 264 F.3d at 1261 (quoting *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000)).

[92] *Gold Res.*, 776 F.3d at 1117, n.8.

[93] *See Fleming*, 264 F.3d at 1269; *Level 3*, 667 F.3d at 1346.

[94] *See Level 3*, 667 F.3d at 1346 ("Defendants' refinancing of Level 3's existing debt at more favorable interest rates most plausibly reflected nothing more than a general desire to further the corporation's interests.").

[95] *Id.*

[96] *See Fleming*, 264 F.3d at 1269; *McNamara v. Pre-Paid Legal Servs., Inc.*, 189 F. App'x. 702, 715 (10th Cir. 2006).

### 3. Plaintiffs' Other Factors Collectively Fail to Raise a Strong Inference of Scienter

In light of the context of Defendants' statements and lack of motive, Plaintiffs' other allegations indicating a strong inference of scienter also are unavailing. In addition to motive, the complaint includes the following allegations that indicate scienter: 1) Spirit's production problems concerned the company's flagship development programs and core operations, 2) numerous knowledgeable corroborating witness accounts, 3) the magnitude of the understated costs, 4) Defendants' violations of accounting principles and certifications, and 5) Defendants' post-class admissions. These allegations must be considered collectively. The significance that can be attributed to a lack of motive depends on the entirety of the complaint.[97] If a defendant's motive is not apparent, a plaintiff still may plead scienter by indicating the defendant's conscious behavior, but the strength of the allegations must be greater.[98]

#### a. Spirit's Production Problems Concerned Core Operations

Plaintiffs argue that knowledge of Spirit's ability to implement cost improvements is inferred to the individual Defendants because of their positions in the company. Defendants contend that this argument should fail because the complaint does not contain any allegations about the information that Defendants were privy to during the class period.

An allegation that a defendant knew certain information based on his position in the company, if combined with relevant factual allegations concerning knowledge, can support a strong inference of scienter.[99] But an allegation that a defendant "must have known" a statement

---

[97] *Tellabs*, 551 U.S. at 325.

[98] *Level 3*, 667 F.3d at 1347.

[99] *See Adams*, 340 F.3d at 1106.

was false or misleading merely because of his position is inadequate.[100] Here, Plaintiffs are asking the Court to infer that Defendants were aware of Spirit's production problems and cost overruns.

Even if Defendants were knowledgeable about these production issues, such a finding does not add much of an inference of recklessness in light of Defendants' disclosures of risk and lack of a duty to disclose in the first place, as discussed earlier. The question is not so much about what Defendants knew but rather about what they disclosed and their duty to disclose. Therefore, this issue does not contribute to an inference of scienter.

### b. Corroborating Witnesses

Likewise, the Court finds that information provided by corroborating witnesses does not add much to an inference of recklessness. Generally, the corroborating witnesses assert that Defendants were aware that cost-reduction goals were not being met at the same time that they made statements extolling the progress being made in their cost-reduction initiatives. This by itself is not enough to show scienter. Defendants make the compelling argument that these statements indicate negligence but not recklessness. In particular, Corroborating Witness 10 offered that Spirit was badly run and that the problems really boiled down to underestimating costs, underbidding projects, and not fully knowing the scope of the projects. Poor management is not the same as recklessness.[101] It is not clear whether a conflict actually existed between internal reports and Defendants' statements. Therefore, the strongest inference the Court can draw is Defendants were negligent, which is far from a finding of recklessness.[102]

---

[100] *Fleming*, 264 F.3d at 1264 (quoting *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 539 (3d Cir. 1999)).

[101] *See Level 3*, 667 F.3d at 1335.

[102] *See id.* at 1345.

### c. Magnitude of the Understated Costs

The magnitude of the alleged falsity can strengthen the inference that defendants knew of the false statements.[103] Plaintiffs argue that the sheer magnitude by which Spirit understated its estimated costs further strengthens Defendants' scienter because either they knew what they were saying was not true or recklessly disregarded available information. Plaintiffs offer two charts accompanying paragraph 174 that purport to show that Spirit understated the costs for the 650 program from 58 percent to 71 percent and understated the costs for the 280 program from 62 percent to 74 percent. As for the 787 program, paragraph 173 and the accompanying chart allege that actual production costs for remaining deliveries were understated by 18 percent in the second quarter of 2012 when Defendants assured investors the program would break even.

Plaintiffs argue that the magnitude by which Spirit understated its future expenses demonstrates that Defendants knew, or were reckless in not knowing, that the programs were not going to break even as publicly stated. Defendants counter by contending that revisions to cost estimates in the third quarter of 2012 do not automatically make cost estimates in prior quarters incorrect or understated or shed light on Defendants' state of mind.

The Court agrees that even if Defendants knew about the magnitude of understated costs, such a finding does not shed much light on their state of mind in light of their disclosures of risk and lack of duty to disclose. And even if the magnitude of understated cost estimates is one factor that strengthens a finding of scienter, it does not meet the scienter requirement by itself.[104] Here, "the complaint as a whole still fails to raise a cogent and compelling inference."[105]

---

[103] *See Adams*, 340 F.3d at 1106.

[104] *See id.*

[105] *Dronsejko*, 632 F.3d at 669.

-30-

### d. Defendants' GAAP Violations

Plaintiffs allege that Defendants violated generally accepted accounting principles and their own internal policy by not immediately recording forward losses when they became evident, which Plaintiffs argue was long before the third quarter of 2012. The Tenth Circuit has held that an allegation of a GAAP violation, standing alone, is not enough to state a securities fraud claim, but it may be sufficient if the allegation is coupled with other evidence that the violation was the result of the defendant's fraudulent intent to mislead investors.[106] Generally, GAAP violations must be "coupled with evidence that the violations or irregularities were the result of the defendant's fraudulent intent to mislead investors."[107]

Here, Plaintiffs allege that Defendants failed to record incurred and projected increased costs as they were happening during the class period and improperly kept reporting the 787 program at a zero margin profit despite no assurance that it would break even. Defendants deny that any accounting principles were violated and deny that there is any evidence of fraudulent intent. The Court declines to determine whether there was a GAAP violation during the class period.[108] But, even if there was, there is insufficient evidence that any violation was the result of Defendants' fraudulent intent to mislead investors.

### e. Defendants' Post-Class Admissions

Plaintiffs cite statements made by Turner and Anderson during a conference call October 25, 2012, the same day the $590 million forward-loss charge was announced. A post-class

---

[106] *Gold Res.*, 776 F.3d at 1113.

[107] *Pirraglia,* 339 F.3d at 1191.

[108] The Court notes that the Securities and Exchange Commission conducted an investigation into the time of Spirit's recognition of forward losses. After briefing was completed for this motion, the SEC notified Spirit that it had closed its investigation without recommending any enforcement action against Spirit. Doc. 64, p. 4-5.

disclosure may contribute to an inference of scienter if it constitutes an admission that defendants spoke fraudulently during the class period.[109] Plaintiffs point to paragraphs 135, 136, and 140 of the complaint to argue that Turner and Anderson made statements about Spirit not being able to achieve cost targets that were contrary to statements they made during the class period. Defendants characterize the statements as an honest acknowledgment of poor business performance and not admissions of fraud. It appears that the October 25 statements do not specifically admit Defendants should have disclosed that Spirit was "experiencing higher than forecast costs" before the third quarter of 2012. Therefore, these statements do not constitute an admission of fraud and do not contribute much, if anything, to an inference of scienter.

### f. The Allegations Taken Collectively Fail to Raise a Strong Inference of Scienter

As noted earlier, the strength of allegations about Defendants' conscious behavior must be greater to support a finding of scienter when a motive is not apparent. Plaintiffs have not met this burden. Considering Plaintiffs' allegations collectively still fails to raise a strong inference of scienter. The relevant question is whether a reasonable person, accepting the allegations as true and taking them collectively, deem the inference of scienter at least as strong as any opposing inference.[110] Here, the opposing inference is that Defendants were overly optimistic about their ability to bring costs down so that the 787 and Gulfstream programs reached a break-even point. During the class period, the Defendants expressed such optimism—while acknowledging the risk of potential forward-loss charges—and eventually gave up when it appeared that Spirit would not break even on these programs.

---

[109] *See Level 3*, 667 F.3d at 1347.

[110] *See id.* at 1343.

The Court finds this opposing inference stronger than the one suggested by the complaint. The Court finds Plaintiffs' suggested inference—that Defendants, with apparently nothing to gain, intentionally or recklessly made materially false statements and delayed recording forward-loss charges to artificially inflate Spirit's stock price—to be the weaker inference. The Court agrees that the allegations are closer to fraud by hindsight, which is a way of saying that "allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud."[111] Therefore, the complaint must be dismissed for failing to raise a strong inference of scienter.

**D. Control Person Liability**

Count II of the complaint seeks to hold each Defendant liable for securities fraud under the secondary theory of control person liability. The issue of control person liability is dependent on the resolution of whether there is a primary violation of the securities laws. Control person liability is another way to hold a corporate officer liable as the statute seeks to hold such an officer jointly and severally liable if that person directly or indirectly controls any person found liable for securities fraud.[112] To establish a prima facie case of control person liability under § 20(a) of the Securities Exchange Act, the plaintiff must establish "(1) a primary violation of the securities laws and (2) control over the primary violator by the alleged controlling person."[113] Because the Court is dismissing Plaintiffs' claims of primary violations of the securities laws, Plaintiffs' § 20(a) claims necessarily also fail.[114]

---

[111] *Fleming*, 264 F.3d at 1260 (quoting *Novak*, 216 F.3d at 309).

[112] 15 U.S.C. § 78t(a).

[113] *Gold Res.*, 776 F.3d at 1118 (quoting *Fleming*, 264 F.3d at 1270).

[114] *See id.*

## IV. Conclusion

To summarize, the Court grants Defendants' Motion to Dismiss the Consolidated Complaint (Doc. 54) with prejudice.[115] The Court dismisses on the basis of Plaintiffs failing to show that Defendants' statements were material. In addition, the Court finds that dismissal is also supported by the complaint failing to raise a strong inference of scienter.

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss the Consolidated Complaint (Doc. 54) is **GRANTED**.

**IT IS SO ORDERED**.

Dated this 14th day of May, 2015.


*Eric F Melgren*

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE

---

[115] Plaintiffs requested in footnote 11 of their response leave to amend under Federal Rule of Civil Procedure 15(a). The Tenth Circuit has affirmed the denial of a similar request made in a single sentence without a statement for grounds to amend. *See id.* at 1118-19. Accordingly, noting that no motion for leave to amend has been filed as required by local rule, the Court declines Plaintiffs' request. *See* D. Kan. Rule 15.1.